

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| **MANUEL ANDERSON,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **NO. 2:13-cv-00208** |
| | § | |
| **SIKORSKY SUPPORT SERVICES, INC.** | § | |
| **d/b/a SIKORSKY AEROSPACE** | § | |
| **MAINTENANCE,** | § | |
| | § | |
| **Defendant** | § | |

PLAINTIFF'S RESPONSE IN OPPOSTION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

## TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, MANUEL ANDERSON, Plaintiff herein, through his counsel of

record, Charles C. Smith, and files this Plaintiff's Response in Opposition to Defendant's Motion

for Summary Judgment pursuant to the Federal Rules of Civil Procedure, and in support thereof

he will respectfully show this Court the following:

### I. OBJECTION TO AFFIDAVITS AND MOTION TO STRIKE

1.      Portions of the affidavit of Jessie Larrabee should be stricken and not used or considered

as proper summary judgment evidence. *Lujan v. National Wildlife Fed'n,* **497 U.S. 871, 888,**

**110 S. Ct. 3177, 3188 (1990).** Some of the assertions contained in Jessie Larrabee's affidavit are

nothing more than bare allegations of fact, conclusory facts or legal conclusions, which if

sustained by this court would not be admissible, *Marshall v. East Carroll Parish Hosp. Serv.*

*Dist.,* **134 F.3d 319, 324 (5th Cir. 1998).** Moreover, some of the assertions contained in Jessie

Larrabee's  affidavit are hearsay. *Williamson v. U.S.* **512 U.S. 594, 598, 114 S. Ct. 2431,2434**

**(1994).**

2.      Specifically, beginning on page 2, paragraph 4 of Jessie Larabee's affidavit, it reads "they

told me they were using pieces of rope to tie down airplanes and one of them made a lasso with

an extra piece.  Then the other employee claims he said, "that likes like a noose" and that he

could make one. The employee said he made a noose and then gave it to the other employee, who held it up as he looked at it. At this time, they told me they were driving by an airplane that was being fueled by several Plane Captains. The employees said they did not know there were other employees in the vicinity at the time. One of the employees (Luis Martinez) said he noticed that one of the Plane Captains was upset. He said he ran after him and immediately apologized, saying that he did not mean to offend anyone. Luis Martinez told me he then found the other Plane Captain and apologized to him as well. This discussion as summarized is hearsay. *Williamson v. U.S.* **512 U.S. 594, 598, 114 S. Ct. 2431,2434 (1994).**

3.    Portions of the affidavit of Rachel Briscoe should be stricken and not used or considered as proper summary judgment evidence. *Lujan v. National Wildlife Fed'n,* **497 U.S. 871, 888, 110 S. Ct. 3177, 3188 (1990).** Some of the assertions contained in Rachel Briscoe's Affidavit are nothing more than bare allegations of fact, conclusory facts or legal conclusions, which if sustained by this court would not be admissible, *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* **134 F.3d 319, 324 (5th Cir. 1998).**

4.    Beginning on page 2, the paragraph 4 of Rachel Briscoe's affidavit, the second sentence that reads "there were other employees with more seniority than Anderson who would have been transferred before him". This is a conclusion without any supporting facts. Moreover, this assertion is nothing more than speculation based on assumptions that have not be verified.

5.    Portions of the affidavit of Michael Braddish should be stricken and not used or considered as proper summary judgment evidence. *Lujan v. National Wildlife Fed'n,* **497 U.S. 871, 888, 110 S. Ct. 3177, 3188 (1990).** Some of the assertions contained in Michael Braddish's Affidavit are nothing more than bare allegations of fact, conclusory facts or legal conclusions, which if sustained by this court would not be admissible, *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* **134 F.3d 319, 324 (5th Cir. 1998).**

6.    Beginning on page 1, paragraph 3 of Michael Braddish's affidavit, the part that reads "Albert Morales denied calling Anderson the "N" word, is hearsay. Other employees who also witnessed the incident told me that Morales did not use the "N" word". This assertion is also

hearsay and not competent summary judgment evidence.

7.      Additionally, Plaintiff objects to that portion of paragraph 3 on page 2 that reads "Morales may have used the Spanish word for the color black (i.e., "negro") or may have referred to a small black girl (i.e., "negrita").  They told me they were not speaking to or about Anderson at the time.  They also told me that Anderson reacted violently for no reason." All of these statements contain hearsay and are therefore not competent summary judgment evidence.

8.      Additionally, the first sentence on page 2, paragraph 4 that reads, "I concluded the altercation was an isolated misunderstanding" is an unsubstantiated conclusion.

9.      Portions of the affidavit of Kenneth Gorman should be stricken and not used or considered as proper summary judgment evidence.  *Lujan v. National Wildlife Fed'n,* **497 U.S. 871, 888, 110 S. Ct. 3177, 3188 (1990).**  One of the assertions contained in Kenneth Gorman's affidavit is nothing more than speculation, conjecture or unsubstantiated conclusion, which if sustained by this court would not be admissible, *Marshall v. East Carroll Parish Hosp. Serv. Dist.,* **134 F.3d 319, 324 (5th Cir. 1998).**  Accordingly, that portion of the last sentence in paragraph 7 on page 3 which reads, "I would have been made aware if any employees had many any such complaints" should be stricken and not used as summary judgment evidence.

## II.   STATEMENT OF THE CASE

10.    This is an employment discrimination case involving claims made by Plaintiff about various acts of discrimination against him as an aircraft mechanic for Sikorsky Support Services, Inc. D/B/A Sikorsky Aerospace Maintenance (hereinafter referred to as Sikorsky). Specifically, Plaintiff contends that he was subjected to racial epitaphs and harassment which created a hostile work environment.  Plaintiff also contends that despite his various reports about the discriminatory treatment he received from some of his co-workers, Sikorsky failed to take adequate and effective remedial action that would do away with the open hostilities that Plaintiff faced on a regular basis.

### III.   STATEMENT OF THE FACTS

11.    Plaintiff began his employment with Sikorsky on or about April 11, 2006, when he was hired as an aircraft mechanic.  As an aircraft mechanic for Sikorsky, Plaintiff was paid $23.84 per hour and reported to Jim Merry, Site Manager.   Plaintiff's immediate supervisor was Mike Gorsline.   As an aircraft mechanic, Plaintiff's responsibilities and duties were, among other things, to trouble shoot and replace parts on the U.S. Navy T-34 Aircraft.  Plaintiff specialized in engine and hot sections inspections on the T-34 PT6-A aircraft engines. **(Anderson's Affidavit Exhibit A)**

12.    Although Sikorsky has a Harassment Free Workplace Policy,  Sikorsky has not dealt with specific incidents of discriminatory and racial harassment that Plaintiff has reported.  For example, in 2008, there was what he considered a racial incident where a large penis-looking object made of masking tape was left on top of Plaintiff's tool box in Hanger 56 for him to see. Plaintiff reported this as a racial harassment issue to Mike Harrington and Max Nanny because it was an offensive stereotype directed toward Plaintiff, a black man.  This incident was not specifically dealt with by Mr. Harrington or Mr. Nanny.  **(Anderson's Affidavit Exhibit A)**

13.    In January 2009, on at least two occasions, Plaintiff found a picture of a monkey placed on his tool box.  Plaintiff reported these as hostile racial incidents directed toward himself as a black man to Mike Herrington his maintenance manager who did nothing to specifically address these things.  Plaintiff also reported the monkey pictures being placed on his tool box to foreman Max Nanny.  Mr. Nanny did nothing to address these issues either.  In fact, when Plaintiff reported the incident to Mr. Nanny, Mr. Nanny responded to Plaintiff's complaint by saying Plaintiff "had alienated everyone in the hanger".  **(Anderson's Affidavit Exhibit A)**

14.     Furthermore, Mr. Nanny told Plaintiff that Plaintiff that he "would not get any help from other employees". Although Plaintiff made reports of these racially hostile incidents to Mr. Harrington and Mr. Nanny, these things continued to occur on a weekly basis and nothing was done to stop it. **(Anderson's Affidavit Exhibit A)**

15.     Also in 2009, there were incidents where hangman's nooses were drawn on Barak Obama (a black man). The hangman's nooses were drawn on magazines and left in the break room where Plaintiff eats, for him to see. Plaintiff considered this racially offensive.

16.     In 2010, Plaintiff found pictures of monkeys with a caption written under the pictures "Obama". All of these pictures were left in the break room for Plaintiff to see. Plaintiff found this to be racially offensive. **(Anderson's Affidavit Exhibit A)**

17.     In 2010, Sikorsky employees continued to taunt Plaintiff saying things like "any monkey can do your job". This was said to Plaintiff often, at least once per week. These remarks were made by white employees who use the term "monkey" relating to "black men". By them using the term "monkey" addressing Plaintiff, he found this to be racially offensive. The employees at Sikorsky considered Plaintiff "a monkey" since he was a black man. **(Anderson's Affidavit Exhibit A)**

18.     For six months, beginning on or about June 2011, Plaintiff was given ten assignments of turning in aircraft engines that someone else had worked on. This was unprecedented because "white employees" were not asked to turn in work or verify work done by other employees. By making Plaintiff do this, his Sikorsky managers Gary Dilly and Bill McDonald were placing him in a position of accepting responsibility for work that he had not done and could not verify as having been done properly. This not only placed Plaintiff in a compromised position it also endangered military personnel. This kept Plaintiff from doing his regular job assignment

because he was now tasked with doing someone else's job.  Having to do these extra

assignments, Plaintiff was pressured to get  his regular job done for which he was falling behind.

This caused Plaintiff much stress by him trying to keep up with his regular job assignments and

the added assignments.  When Plaintiff reported this in June 2011 to his lead, Freddy Lugo, and

his foreman Gary Dilly, they did nothing to correct the situation.  To make matters worse, Ken

Gorman gave Plaintiff two extra assignments working on engines which caused him added

stress.  Nonetheless, Ken Gorman assured Plaintiff that if he got these jobs done Mr. Gorman

would transfer Plaintiff to Component Repair.  Plaintiff was not transferred until sometime after

he came back from Las Cruces, New Mexico, but although he was transferred to Component

Repair, Ken Gorman still had him complete the two extra job assignments which were against

Sikorsky policy.  Sikorsky policy is that employees in Component Repair are not to be removing

or replacing engines from aircraft.  Having to do these assignments which were ordered by Ken

Gorman was unprecedented.  No one has ever had to do this but Plaintiff. **(Anderson's Affidavit**

**Exhibit A)**

19.     In April 2011, there was the incident where Plaintiff was asked to apologize to employees

at Work Center 140 and specifically to Albert Morales for telling them to "watch their mouth",

when Plaintiff had heard them use the term "nigger" or "nigga" in the workplace.  Plaintiff had

refused to apologize for his comment because he found the terms racially offensive.  Mr. Mike

Braddish, Plaintiff's supervisor told Plaintiff to apologize for something that he knew was

racially offensive to Plaintiff. **(Anderson's Affidavit Exhibit A)**

20.     In January 2012, a racially offensive note using the term "Nigger" was placed in the

break room where Plaintiff eats.  This note was left where Plaintiff sits.  This racially offensive

note was placed there for Plaintiff to see.  Although Plaintiff reported this immediately to Ken

Gorman and even took the note to him, Mr. Gorman did nothing about this.  When Plaintiff reported this to Ken Gorman, he took Steve Buchannan with him as a witness.  Mr. Buchannan later followed up by filing an EEO complaint with Sikorsky.  All supervisors would go into the break room daily and could see racially offensive pictures. **(Anderson's Affidavit Exhibit A)**

21.      On or about January of 2012, lead man Jay O'Brien who was the supervisor in charge of all the Sikorsky employees who were detached in Las Cruces, New Mexico used the "N" word in Plaintiff's presence.  Plaintiff told Mr. O'Brien that he didn't play games with the "N" word, but O'Brien continued to use the word daily in Plaintiff's presence for the entire three months that he was in Las Cruces New Mexico between the months of January 2012 through March 2012.  This got so pervasive that Plaintiff asked management to send him home from assignment in Las Cruces, New Mexico where he was forced to work with Mr. O'Brien.  While in Las Cruces, New Mexico, the racial harassment toward Plaintiff got so severe that the white employees left him stranded at the airport without a ride for over two hours while they went sightseeing and shopping. **(Anderson's Affidavit Exhibit A)**

22.      In 2012, lead man Jay O'Brien continually used the "N" word in Plaintiff's presence.  At one time while in Las Cruces on assignment, Plaintiff had to ask him for a ride because other white employees would not allow him in their vehicles.  Mr. O'Brien responded by saying "Ok, you can ride with me, I have my "Nigger Driver".  The next day, Plaintiff reported this incident to Tom a maintenance control manager.  To this day, Mr. O'Brien, a Sikorsky supervisor continues to use the "N" word in Plaintiff's presence. **(Anderson's Affidavit Exhibit A)**

23.      Sometime in December 2007, Plaintiff submitted a Job Preference request asking to be moved to Work Center 500.  Although there were no openings at the time, when an opening was available, although Plaintiff had submitted a Job Preference request and was a senior employee,

he was overlooked.  Sikorsky policies were not followed in choosing who would get the job in Work Center 500.  Plaintiff's job preference had been on file since 2007 and re-emphases was given in 2008 and 2009 and still the job was given to a junior employee.  Ms. Rachel Briscoe, Human Resources Manager was aware that Plaintiff wanted to be moved for at least 3 years. **(Anderson's Affidavit Exhibit A)**

24.     Plaintiff had also reported to Ms. Briscoe that Sikorsky employee Ed Jones was mocking Plaintiff's speech and she asked that Plaintiff not file an EEO complaint and give her opportunity to correct this.  Even so, Mr. Jones continued to mock Plaintiff after he reported him to Ms. Briscoe and even three months later threatened to beat Plaintiff up.  He did this in the presence of other Sikorsky employees including Mr. Lugo Plaintiff's crew leader.  Mr. Lugo did nothing about this. **(Anderson's Affidavit Exhibit A)**

25.     While in Las Cruces, Plaintiff asked Clint, a detachment manager, why only whites were issued cars and why the four black employees could not have a car.  He responded, "We issue cars to whom we want to".  When Plaintiff asked him to send Plaintiff back home, he responded, that He couldn't send Plaintiff home "because he needed some time".  **(Anderson's Affidavit Exhibit A)**

26.     There was also an incident in Las Cruces, New Mexico where Plaintiff was on a balcony and asked a white manager (Tom), to hand him his jacket so that he could get his hotel key out of it.  Tom threw Plaintiff's jacket up to him and the key fell out of the pocket.   The non-black employees were not treated in the same manner. In order to taunt Plaintiff, white employees took his hotel key and told him that he could only get it back if he paid them money.  As Plaintiff reached for his wallet which was in his jacket, Plaintiff's bank card fell out and they kept it also. For about 20 minutes these white Sikorsky employees taunted Plaintiff and would not return his

key or bank card.  A fight almost started because of this racially hostile incident and they finally

returned Plaintiff's hotel key and bank card.  Plaintiff has had to put up with racial hostility for

many years while employed by Sikorsky Management has known of this and has done nothing to

address Plaintiff's specific complaints. **(Anderson's Affidavit Exhibit A)**

27.     Although Sikorsky did hold meetings in 2012 regarding their Harassment Free

Workplace Policy after Plaintiff had reported incidences, of which Plaintiff attended, these

meeting did not stop the racial harassment.  Nor did these meetings address any specific reports

Plaintiff made.  The subject matter of the meetings did not address specifics, nor did the

discussions talk about measures to be taken by Sikorsky to prevent similar or other misconduct

in the future.  The measures which were in place before Plaintiff reported racial harassment and

discrimination were not sufficient to stop the employees from this type of behavior.  Moreover,

the policies were not effective and Sikorsky did not modify or change practices or policies to

make a difference in the behavior of subordinate employees.  The policies in place did not

prevent or discourage non-compliance and meetings held did nothing to bolster compliant

behavior.  Sikorsky in a perfunctory manner simply re-stated or re-emphasized its policies.  As

a result, employees were not provided with new standards or expectations involving non-

discriminatory conduct.  For example, Sikorsky did not implement or take any steps to monitor

employee behavior after Plaintiff made his reports of discriminatory conduct or racial

harassment. **(Anderson's Affidavit Exhibit A)**

## IV. <u>STANDARD OF REVIEW</u>

**A.     Summary Judgment pursuant to Federal Rules of Civil Procedure 56**

28.     In federal civil practice, summary judgment is proper if the pleading, the discovery and

disclosure materials on file and any affidavits show that there are no genuine issues of material

fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrell*, **477 U.S. 317, 322, 106 S. Ct 2548, 2552 (1986)**; *Baton Rouge Oil & Chem. Workers Un. v. Exxon Mobil Corp.,* **289 F.3d 373, 375, (5th Cir. 2002)** The burden of proof in a summary judgment proceeding is on the same party who would bear the burden of proof at trial *Celotex*, **477 U.S. 324, 106 S. Ct at 2553.**

29.     Under Federal Rules of Civil Procedure 56(c), when the moving party has carried its burden, the non-moving must demonstrate that there is a genuine issue of material fact and not merely allege that there is a factual dispute *Scott v. Harris*, **550 U.S. 372, 379, 127 S. Ct. 1769 (2007).**

30.     A genuine issue is one that can be determined only by a trier of fact since it may be resolved in favor or either party. *Anderson v. Liberty Lobby, Inc.* **477 U.S. 242, 106 S.Ct. 2505 (1986)**; *Meadowbriar Home for Children, Inc. v. Gunn*, **81 F.3d 521, 533 (5th Cir. 1996).** A material fact is one that can affect the outcome of the suit under the governing substantive law. *Anderson,* **477 U.S. 248, 106 S.Ct 2510.** Consequently the substantive law necessarily determines which facts are material. *Douglass v. United Servs. Auto Ass'n*, **79 F.3d 1415, 1423 n.11 (5th Cir. 1996).**

## V. <u>ARGUMENTS AND AUTHORITIES</u>

### A.     HOSTILE WORK ENVIRONMENT

31.     For claims involving a hostile work-environment, the Plaintiff must create a fact issue on each of the elements regarding (1) racially discriminatory intimidation, ridicule and insults that are; (2) sufficiently severe or pervasive that they; (3) alter the conditions of employment; and (4) create an abusive working environment. *Walker v. Thompson;* **214 F.3d 615 (5th Cir. 2000).** Plaintiff has more than met his burden to establish these elements.  When viewed from the total

length of time Plaintiff has endured some form or racial harassment, he has satisfied his legal requirements for this claim.  **(Anderson's Affidavit Exhibit A)**

32.     The U.S. Supreme Court has already held that discriminatory verbal intimidation, ridicule and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII.  *Harris v. Forklift Systems, Inc. 510 U.S. 17, 20-21*; **114 S. Ct. 367, 370-71, (1993).**  The Supreme Court stated in its decision in *Harris*, in determining whether a work environment is "hostile" or 'abusive", all the circumstances must be considered including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

33.     The real issue in this case is whether an employer, like Sikorsky, should be held liable for discriminatory acts of its employees where the employer has not adequately dismantled its culture of discriminatory conduct by its employees. The U.S. Supreme Court has held employers liable where the employer had actual knowledge of the harassing action by subordinates or co-workers and did nothing to stop it. *Faragher v. City of Boca Raton*, **524 U.S. 775, 785, 118 S. Ct. 2275, 2285 (1998).**

34.     According to Plaintiff, he has endured racial harassment at work for Sikorsky for a period of time since 2007.  The racial harassment described by a Plaintiff covered a time span greater than five years.  For example, Plaintiff saw pictures of hangman's nooses at his workplace **(Anderson's Depo 42:25:1; 43:2-5 Exhibit B).**  During the same time, a co-worker, Ed Jones **(Anderson's Depo 43: 6-12 Exhibit B)** wanted to take Plaintiff outside "and beat me up" **(Anderson's Depo 43:2-5 Exhibit B)**.  The incident was reported to Plaintiff's supervisor,

Freddy Lugo, crew leader who "was standing right there and didn't do anything about it **(Anderson's Depo 46:2-4 Exhibit B).**

35.    Afterwards, that same day, Plaintiff told Mr. Lugo that he was "being harassed" **(Anderson's Depo 46:19-25 Exhibit B),** and Mr. Lugo's response to Plaintiff was, "take it to management **(Anderson's Depo 46:24 Exhibit B),** which Plaintiff did when he talked to Rachel Briscoe **(Anderson's Depo 47:3 Exhibit B)** Human Resource Manager **(Anderson's Depo 47:21-22 Exhibit B).**

36.    A couple of days later, Plaintiff spoke to Ms. Briscoe and told her the following:

> **A      I told her that I was being harassed and that people were mocking me, my language, with my speech, and that I was being harassed.  And that I wanted to file, I wanted to file a, with EEOC. (Anderson's Depo 47:25;48:1-3 Exhibit B)**

37.    Specifically, while talking to Ms. Briscoe, the following exchange occurred with Ms. Briscoe:

> **Q      Okay. Tell me exactly what you told her that was going on. (Anderson's Depo 48:6-7 Exhibit B)**
>
> **A      I told her that I was having some problems with my co-workers and that – she said that – she asked me if she could handle it, give her the opportunity to handle that with the maintenance manager, and to hold off filing any kind of EEOC complaint until they were able to, and I agreed to it. (Anderson's Depo 48:8-13 Exhibit B)**
>
> **Q      She asked you to hold off filing an EEOC complaint until they were able to investigate? (Anderson's Depo 48:14-15 Exhibit B)**
>
> **A      Yes (Anderson's Depo 48:16 Exhibit B)**

38.     Plaintiff told Ms. Briscoe that one of the employees was mocking his speech and Ed

Jones (**Anderson's Depo 48:18-22 Exhibit B**).  When asked why he believed the employee

mocking was racial, Plaintiff said the following:

> **Q      Okay.  And what does that have to do with your race, if they were making**
>
> **fun of the way you talk? (Anderson's Depo 50:10-11 Exhibit B)**
>
> **A      About my ethnicity, speaking like black people speak.  Some black people**
>
> **speak different than other ones.  I mean, I don't have perfect, I don't speak**
>
> **perfect English, and I just don't appreciate anyone trying to mock me.**
>
> **(Anderson's Depo 50: 12-16 Exhibit B)**

39.     Moreover, unfortunately for Plaintiff, the mocking occurred on a daily basis (**Anderson's**

**Depo 50:18 Exhibit B**).

> **Q      How many times would they mock your speech? (Anderson's Depo 50:17**
>
> **Exhibit B)**
>
> **A      It's a daily basis. (Anderson's Depo 50:18 Exhibit B)**

40.     To make matters worse, although Plaintiff would ask the employees to stop mocking him,

(**Anderson's Depo 50:22-23 Exhibit B**) their response "was a lot of laughter" (**Anderson's**

**Depo 51:1 Exhibit B**).  In 2007, Plaintiff also reported an incident involving his tool box when

he found a "big penis and balls taped on top of my toolbox" (**Anderson's Depo 52:2-5 Exhibit**

**B**) after he arrived at work in the morning (**Anderson's Depo 52:17-21 Exhibit B**).  Plaintiff

reported the incident to his supervisor, Dave Burkhardt (**Anderson's Depo 52:22-25 Exhibit B**)

who told Plaintiff that he needs "to have a sense of humor" (**Anderson's Depo 53:4-5 Exhibit**

**B**).

41.     The following year, in 2008, Plaintiff found a picture of President Obama with a

hangman's noose around his neck (**Anderson's Depo 55:21-2 4Exhibit B**) The image was in the

break room where Plaintiff takes his breaks (**Anderson's Depo 56:1-2 Exhibit B**) Under oath,

Plaintiff provided the following description:

> **Q** . **Was that a drawing?  Was that sort of a newspaper or magazine picture?
> (Anderson's Depo 56:3-4 Exhibit B)**
>
> **A** **Any time, any time it was a picture of President Obama or Mr. Obama come
> up, it would, somebody would draw hangman nooses around his neck.  It was
> paper or newspaper or magazine, didn't make a difference.  It was on a daily
> basis. (Anderson's Depo 56:5-9 Exhibit B)**
>
> **Q** **Okay, Do you know why whoever did that was putting nooses around
> President Obama?  Do you know why? (Anderson's Depo 57:12-13 Exhibit
> B)**
>
> **A** **Because of their racist ways.  It's happened in, for, in real terms, they had
> hangman nooses dragging around on golf carts -- (Anderson's Depo 57:14-16
> Exhibit B)**
>
> **Q** **Okay. (Anderson's Depo 57:16 Exhibit B)**
>
> **A** **-- out there. (Anderson's Depo 57:18 Exhibit B)**

42.   Except a co-worker, Robert Vincent, Plaintiff did not specifically report the hangman's

noose on a picture of President Obama to anybody else (**Anderson's Depo 58:6-13 Exhibit B**)

However, when asked if he showed the pictures to anyone else, Plaintiff said the following:

> **Q** **Did you show these pictures to anybody else other than Robert Vincent?
> (Anderson's Depo 59:24-25 Exhibit B)**
>
> **A** **No, but I'm quite sure everybody in the hangar saw them.  They were on**

display out on the tables, on the break tables.  (Anderson's Depo 60:1-3

Exhibit B)

Q     You just think people walked around and saw those pictures? (Anderson's

Depo 60:4-5 Exhibit B)

A     Yes (Anderson's Depo 60:6 Exhibit B)

Q     Just because they were in the newspapers in the break room? (Anderson's

Depo 60:7-8 Exhibit B)

A     Yes (Anderson's Depo Exhibit B)

43.    Afterward, Plaintiff talked to the Site Manger in 2012 **(Anderson's Depo 60:10-23**

**Exhibit B)**.

44.    The next incident of harassment occurred in April 2011 when Albert Morales called

Plaintiff the "N" word in the break room in Hanger 56 at the end of the day.**(Anderson's Depo**

**71:15-25 Exhibit B)**.  Specifically, Plaintiff claims that Mr. Morales said "Something about a

nigger, nigger bitch or something like that" **(Anderson Depo 72:24-25 Exhibit B)**.  According

to Plaintiff, Mr. Morales made a comment to Plaintiff when Mr. Morales was "looking directly at

my face when he said it" **(Anderson's Depo 73:5-6 Exhibit B)**.  Startled, Plaintiff responded to

Mr. Morales that he "needed to watch what he was saying, and better watch his mouth".

**(Anderson's Depo 74:16-19 Exhibit B)**.  Following this exchange, at the end of his shift,

Plaintiff went to report that incident to Brent Adams and Mike Braddish, but they were not in

their office. **(Anderson's Depo 75:10-18 Exhibit B)**.  As a result, Plaintiff reported the incident

to Mr. Adams who was the Maintenance foreman.  **(Anderson's Depo 76:1-2 Exhibit B)**.

45.    In response, according to Plaintiff, Mr. Adams and Mr. Braddish wanted Plaintiff to

apologize **(Anderson's Depo 78:1-6 Exhibit B)**, but Mr. Braddish told Plaintiff "we don't want

this to go corporate" **(Anderson Depo 78:18 Exhibit B).**

## B. INADAQUATE REMEDIAL ACTION

46.     Consistent with Fifth Circuit precedent, *Boldware v. Denton County, Texas*; **741 F. 3d,**

**635 (5th Cir. 2014)** outlines what a Plaintiff must establish for a hostile work environment claim

under Title VII.  Those elements include: (1) belongs to a protected group; (2) was subjected to

unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment

complained of effected a term, condition, or privilege of employment; and (5) the employer

knew or should have known of the harassment in question and failed to take prompt remedial

action.  The court noted, citing, *Hockman v. Westward Commc'ns, LLC*, **407 F.3d 317, 329 (5th**

**Cir. 2004)** that "what constitutes prompt remedial action is a fact-specific inquiry and "not every

response by an employer will be sufficient" to absolve the employer of liability under Title VII.

Id. (citation and internal quotation marks omitted)

47.     For purposes of a Title VII Hostile Work environment claim, *Hockman,* provides

important insight into what conduct both the Plaintiff and Sikorsky must set out in support of

their relative positions surrounding the claim.  Here in the instant case, the sum total of all of

Sikorsky's responses to the reports made by the Plaintiff, do not satisfy the "prompt remedial

action" contemplated in *Boldware*.  Courts have long held that with respect to a hostile work-

environment, "an employer may be liable despite having taken remedial steps if the plaintiff can

establish that the employer's response was not reasonably calculated to halt the harassment."

48.     According to Plaintiff, on at least three occasions, he identified what he believed was

racial harassment from his co-workers.  However, despite any "meeting" conducted by Sikorsky

to address Plaintiff's concerns, Sikorsky did little more than go through the motion.  The subject

matter at the meeting was not fact specific on the issues and incidents raised by Plaintiff.

Moreover, Sikorsky did not tailor or modify its enforcement practices to deal with anonymous or surreptitious behavior of some of its employees.  As a consequence, the offensive behavior continued on "a daily basis" **(Anderson's Affidavit Exhibit A).**

49.     Courts have also stressed that "whether an employer's response to discriminatory conduct is sufficient will necessarily depend on the particular facts of the case; the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. *Hirras v. Nat'l RR. Passenger Corp.,* **95 F.3d at 399-400 (5th Cir. 1996).**  Based on Plaintiff's experiences, Sikorsky response was insufficient.  What is more indicative of "severity and persistence" if the harassing conduct occurs on "a daily basis".  Moreover, by definition, how effective are any "remedial steps" if the undesired behavior continues. **(Anderson's Affidavit Exhibit A).**

50.     Beginning in 2007, Plaintiff first encountered what he viewed and perceived as racial harassment.  Nearly five years later, not much had changed. **(Anderson's Affidavit Exhibit A).**

51.     There was a racial incident in January 2012, when some employees asked Plaintiff to look at something on the table where there was a note with the word nigger on the desk **(Anderson's Depo 81:15-18 Exhibit B).**  Both Plaintiff and Steve Buchannan went to report the note to Brent Adams **(Anderson's Depo 83:1 Exhibit B)** Maintenance foreman **(Anderson's Depo 83:6-13 Exhibit B)** who directed them to talk to Mr. Gorman Maintenance manager **(Anderson's Depo 83:17-23 Exhibit B).**  Subsequently, Plaintiff and Mr. Buchannan met with Mr. Gorman and David Macias, Site Manager who said he would investigate matter **(Anderson's Depo 84:13-25 Exhibit B).**  However, they never got back with Plaintiff about the incident **(Anderson's Depo 85:7-9 Exhibit B).**  To make matters worse, after Plaintiff reported this incident, he found "regular old hangman nooses" **(Anderson's Depo 87:8-10 Exhibit B).**

52.     Unfortunately, this was not an isolated incident.  In April 2012, Plaintiff heard about a

hangman's noose behind their golf cart **(Anderson's Depo 87:19-25 Exhibit B)** for which

several employees were suspended.  **(Anderson's Depo 92:15-18 Exhibit B).**  Nonetheless, after

that incident, on a daily basis, Plaintiff has witnessed hangman nooses in the workplace

**(Anderson's Depo 92:15-21 Exhibit B).**  When asked about this, Plaintiff testified as follows:

> **Q**     **After this incident, have you witnessed any hangman's nooses in the**
>
> **workplace?  (Anderson's Depo 92:19-20 Exhibit B)**
>
> **A**     **It's happening on a daily basis. (Anderson's Depo 92:21 Exhibit B)**
>
> **Q**     **I'm asking you after this incident have you witnessed. (Anderson's Depo**
>
> **92:22-23 Exhibit B)**
>
> **A**     **Yes, Yes (Anderson's Depo 92:24 Exhibit B)**

53.     Whatever steps taken by Sikorsky to address the hangman noose incident, the problem

did not go away.  When confronted about this issue, under oath, Plaintiff said:

> **Q**     **Okay.  When was the next time you witnessed a noose?  (Anderson's Depo 92**
>
> **25; 93:1 Exhibit B)**
>
> **A**     **It's a common practice for them to do it.  I can't say when. It happens all the**
>
> **time. (Anderson's Depo 93:2-3 Exhibit B)**
>
> **Q**     **You think it happens all the time?  (Anderson's Depo 93:4 Exhibit B)**
>
> **A**     **Yes (Anderson's Depo 93:5 Exhibit B)**

54.     Co-workers were not the only Sikorsky employees making derogatory or racial

comments.  Some supervisors made racial or derogatory terms, when asked about this, Plaintiff

said the following:

> **Q**     **Okay, I'm not asking about that.  I'm asking you has anybody, any**
>
> **supervisor called you a racial term or a derogatory term?  (Anderson's Depo**

> 112:25; 113:1-2 Exhibit B)

> A     I've heard supervisors, yes, say "nigger" all the time.  **(Anderson's Depo 113:3-4 Exhibit B).**

55.     This included a line foreman, Jay O'Brien who Plaintiff had to work with **(Anderson's Depo 113:8-16 Exhibit B).**

56.     One important aspect of this analysis examines whether or not the prompt remedial action' must be "reasonably calculated "to end the harassment."   *Skidmore v. Precision Printing and Packaging Inc.* **188 F.3d 606 615 (5th Cir. 1999).**  Moreover, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment." *Skidmore* at **615- 616.**

57.     For several years, Plaintiff had to endure an unpleasant ordeal generated by hate and ignorance.  What's more, some of Sikorsky lower-level leadership was not immune from spewing racial invectives.  Unfortunately, the use of the "N" word is all too common. One illustration of this was demonstrated by the following exchange that is part of Plaintiff's testimony in which he said the following in regards to a line foreman, Jay Obrien:

> A     **I've heard supervisors, yes, say "nigger" all the time.  (Anderson's Depo 113:3-4 Exhibit B)**

When Plaintiff expressed his objection, Plaintiff described the response as follows:

> Q     **Okay. And what did he tell you in response? (Anderson's Depo 114:17 Exhibit A)**

> A     **he said, I think he said he won't do it around me (Anderson's Depo 114:18-19 Exhibit A)**

## C.  Plaintiff's Discrimination Claims are Not Time-Bared

58.     In *Ramsey v. Henderson* **286 F.3d 264 (5th Cir. 2002)**, the court addressed acts that occurred outside of the filing period.  In particular, the court stated, for a hostile working environment to be deemed sufficiently hostile, all of the circumstances must be taken into consideration.  Discriminatory incidents outside of the filing period may be relevant background information to current discriminatory acts.  *United Air Lines, Inc. v. Evans*, **431 U.S. 553, 558, 97 S.Ct. 1885 (1977).**  For a Title VII claim, filed pursuant to **42 U.S.C. 2000e-5 (e) (1) (2003)**, a claimant must file a Title VII discrimination claim with the EEOC within 300 days of the challenged discrimination.  *Byers v. Dallas Morning News*, **209 F.3d 419, 424 (5th Cir. 2000).**

59.     According to Plaintiff, some of the battles he has undertaken regarding racial hostilities at Sikorsky remain unresolved.  Some of the more egregious acts have occurred within the past several years.  However, it cannot be lost that to fully appreciate the failure of Sikorsky to undertake effective remedial actions to change its culture regarding racial matters, one has to examine broadly Sikorsky's entire history as it relates to Plaintiff.  Therefore, to give perspective to Plaintiff's unpleasant encounters, the events as far back as 2007 need to be considered.  Moreover, Plaintiff's reliance on the broad use of discrimination in his charge of discrimination is largely rendered moot since his racial claims are covered under Section1981.

## VI. <u>CONCLUSION</u>

It is clear from the available facts developed in this case; Plaintiff had to endure a run of harassment based on his race.  This harassment took the form of offensive utterances and symbols as well as Sikorsky's apparent indifference to put in measures to stamp out the unabated culture of racial hostility towards some black employees.  Despite Sikorsky's efforts to minimize the vile language used against Plaintiff with the "N" word, its disgusting historical legacy rings

loud today as it did over a century ago.  Nonetheless, the key is Sikorsky's failure to institute

remedial steps that would curve and eliminate the racial hostility towards Plaintiff.

Unfortunately on account of Plaintiff's steadfast efforts to work through the attitudes of some of

his co-workers, he should be allowed to present his claim before his peers.  Consequently,

Skiorsky's Motion for Summary Judgment should be denied.


**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully requests that

Defendant's Motion for Summary Judgment be denied, and be awarded his costs and attorney's

fees and any other relief to which he may be justly entitled to receive.


Respectfully Submitted,


*/s/ Charles C. Smith*
Charles C. Smith
Law Office of Charles C. Smith
615 N. upper Broadway, Suite 1710
Corpus Christi, Texas 78401
Telephone No.:  78401
Facsimile No. : (361) 883-4041
E-Mail:  ccsmithlaw@aol.com
State Bar No18550210
Admission No. 4312

## CERTIFICATE OF SERVICE

I, Charles C. Smith, do hereby certify that a true and correct copy of the foregoing

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment was

forwarded, via electronic case e-filing and CMRRR 70133020000125375500 via Facsimile (713)

225-2340 on July 17, 2014 to the following counsel of record:

Esteban Shardonofsky
Attorney at Law
SEYFARTH SHAW LLP
700 Louisiana Street, Suite 3700
Houston, Texas  77002

*/s/ Charles C. Smith*
Charles C. Smith